UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **DARYL GILLESPIE**, | § | |
| | § | |
| *Plaintiff,* | § | |
| **VS.** | § | CIVIL ACTION NO. 4:13-cv-1481 |
| | § | |
| **CAROLYN W. COLVIN**, | § | |
| Acting Commissioner of the Social | § | |
| Security Administration | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

Plaintiff Daryl Gillespie ("Gillespie") filed a lawsuit to challenge the denial of his application for Social Security benefits. Dkt. 1. Defendant Carolyn W. Colvin ("Commissioner"), Acting Commissioner of Social Security, answered and filed a Motion for Summary Judgment and Memorandum in Support. Dkt. 11, 12. The parties have consented to have this Court conduct all proceedings, pursuant to 28 U.S.C. § 636(c). Dkt. 8. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court orders that summary judgment be **GRANTED** for the Commissioner.

## I.    BACKGROUND

Darryl Gillespie is a 56-year-old man who suffers from hypertension, heart disease, an abdominal hernia/"stomach bulge," back problems, and swelling in his feet. Gillespie is 5'11" and weighs approximately 300 lbs. Gillespie did not finish high

school, but he received a GED and completed a welding class. His past work has been as a truck driver, both driving and loading trucks. Gillespie stopped working in January 2009.

### A.    Gillespie's Medical Records and SSI Application

On August 16, 2002, Gillespie went to the emergency room at Methodist Hospital in Sugar Land complaining of lower back pain, "constant, stabbing abdominal pain," constipation, and vomiting. Tr. 185. Although his blood pressure was elevated, he was described as oriented, with an unsteady gait. Tr. 186. A CT scan of his abdomen did not reveal any problems. Tr. 191. The pain eventually resolved on its own, and Gillespie was given basic dietary counseling and discharged. Tr. 189.

Sometime in 2004, Gillespie began visiting the Bissonnet Medical Center on a regular basis. On November 5, 2004, the Center's Dr. Muhammad Shaikh, M.D., wrote Gillespie a prescription to treat his high blood pressure. Tr. 249. On December 28, 2004, Gillespie again visited the Center complaining of a cough. He weighed 303 pounds at that visit, and his blood pressure was 166/104. The section titled "Objective Physical Exam Findings" simply has checkmarks next to each category, but no other notes. Tr. 250. No problems with his abdomen were noted.

On September 12, 2005, Dr. Shaikh signed a form stating that Gillespie was "released to return to work" on September 16, 2005. Tr. 245. Dr. Shaikh also noted that he had "advised rest." *Id.* The record does not explain why Gillespie been absent from work, or the reason Dr. Shaikh decided he could return to work.

Over a year and a half year later, on May 7, 2007, Gillespie again saw Dr. Shaikh. This time, Gillespie reported that he had visited another clinic in the preceding week because of chest pain and high blood pressure. Tr. 242. Gillespie's blood pressure at that visit was 168/88 and his physical exam did not note any abnormal findings, including "abdominal masses," "abdominal tend[ernes]," or "edema". Tr. 243. Two days later, on May 9, 2007, Gillespie was seen for a follow-up and complained of "generalized fatigued." Tr. 240. At this visit—for the first time—a notation is made next to the entry for "abdominal mass" on the section of the form entitled "Physical Exam." The note, however, is illegible and no tests were ordered, other than a urinalysis for a possible urinary tract infection. Tr. 241. No abdominal tenderness, pain, or edema was present.

On May 24, 2007, Gillespie again visited Dr. Shaikh, complaining of generalized weakness, erectile dysfunction, and "lack of energy." Tr. 238. His blood pressure was 157/98. Tr. 239. As with the previous visit, the box for "abdominal mass" was checked in the "Physical Exam" section, and a scrawled note of "protuberant hernia" appears next to the checkmark. However, no abdominal tenderness, pain, or edema was present. No tests or follow-up other than "counseling" were ordered. Tr. 239.

On August 8, 2007, Gillespie again complained of "fatigue, tenderness, lack of energy, and erectile dysfunction on and off" but he did not complain of abdominal pain. Tr. 236. As with earlier visits, a physical exam noted an "abdominal mass" with a handwritten note of "protrusion abd" but no notes of abdominal tenderness, pain, or edema were made, and no follow-up other than "counseling" was ordered. Tr. 237. At follow-up visits on August 14 and August 21, Gillespie stated that he "felt better" but that

he had some "difficulties in daily activities." Tr. 234, 232.  At the August 21 visit, Gillespie's blood pressure was 158/89 and no abdominal mass was noted during the physical exam. Tr. 233.  On August 27, 2007, Dr. Shaikh completed a "Certification of Health Care Provider," stating that Gillespie suffered from the "chronic conditions" of "uncontrolled hypertension and symptoms of fatigue . . . felt dizzy, SOB on mild exertion." Tr. 230.  Dr. Shaikh indicated, however, that it was not necessary for Gillespie to work less than a full schedule or to miss work. *Id.*  Instead, he stated Gillespie "needs to continue meds and medical follow up for BP." *Id.*

In a follow-up visit on September 5, 2007, Gillespie stated that he was "taking meds as prescribed" but he complained that his blood pressure was still high.  Tr. 228. His blood pressure recorded as 161/83, and an "abdominal mass/hernia" was again noted, without any abdominal tenderness, pain, or edema. Tr. 229.  Again, no tests or follow-up other than "counselling" were ordered. *Id.*  Dr. Shaikh filled out an "Excuse Slip" stating that Gillespie "is unable to return to work at this time because of medical until next f/u 9/10/2007."   The note further stated, "Medications: 3rd BP meds added" and "Restrictions: low salt/ low fat diet." Tr. 227.

On May 21, 2008, Gillespie visited the Center complaining—for the first time—of his "main problem" being "a protuberant abdomen" causing him "discomfort" and "generalized fatigue." Tr. 225.  During the physical exam, a "protuberant" abdominal mass was noted, but no abdominal tenderness, pain, or edema was noted.  Again, no tests were ordered other than a strep test. Tr. 226.  At this visit, Dr. Shaikh signed another

"Excuse Slip" stating that Gillespie "is unable to return to work at this time because of medical reasons until 5/27/2008." Tr. 224.

On May 27, 2008, Gillespie stated that he was "feeling much better able to go back to work." Tr. 222. A physical exam again revealed an "abdominal mass" but no abdominal tenderness, pain, or edema were noted. Tr. 223.

On May 30, 2008, Gillespie again stated that he was "feeling better." Much of the record from this visit is illegible, but the physical exam notes reveal that Gillespie did not have an abdominal mass or tenderness, nor did he have any swelling or other physical problems. Tr. 221. Again, counseling and follow-up visits were recommended. *Id.*

On June 2, 2008, Gillespie stated that he was "feeling better tiredness improved." Tr. 217. His blood pressure was recorded as 143/78, his weight was 313 pounds, and his pulse was 58 bpm. Tr. 218. No abdominal mass, tenderness, or swelling was noted during the physical exam. *Id.* Counseling and follow-up visits were again recommended. *Id.*

On August 18, 2008, Gillespie again complained of high blood pressure. Other complaints he made at that visit are illegible. Tr. 214. Gillespie's physical exam again noted an "abdominal mass" with the note, "umbilical hernia," and the visit synopsis stated "HTN uncontrolled, Hernia, Fatigue." Tr. 215. No abdominal tenderness, pain, or swelling was noted. At that visit, Dr. Shaikh wrote a letter stating that Gillespie "was under my treatment from 05/21/2008 for his high blood pressure. Today I have examined him and his blood pressure is well in control. He is able to join his work." Tr. 216.

On November 12, 2008, Gillespie complained of high blood pressure, and admitted that he had not taken his medications. Tr. 210. An abdominal mass was noted, but no abdominal tenderness, pain, or edema was noted. The synopsis at that visit reads: "HTN, Obesity, Erectile Dysfunction, Noncompliance & Med. [Illegible], Umbilical Hernia." Tr. 211. At that visit, Dr. Shaikh, signed another "Excuse Slip," stating that Gillespie "is unable to return to work at this time because of medical reasons until next f/u 11/17/08." Tr. 213.

On March 3, 2009, Gillespie again visited the Center. Tr. 208. His complaints at that visit are not legible. His blood pressure was 197/96, and his weight was 300 pounds. Tr. 209. An abdominal mass was again noted, but no pain, swelling or tenderness was recorded, and only counseling was recommended. *Id.*

On May 12, 2009, Gillespie was working at home on the computer when he experienced sharp chest pains and called for an emergency ambulance. Tr. 140. By the time he was admitted to Methodist Hospital in Sugar Land, Texas, he was noted to have "edema" in his lower extremities but his chest pain had resolved. Tr. 136. An EKG was performed, and a cardiologist consulted. The cardiologist, Dr. Sherman Tang, M.D., stated that the EKG had revealed "sinus bradycardia, heart rate 50 beats per minute." Tr. 142. Dr. Tang also stated, however, that "myocardial infarction was ruled out," and cleared Gillespie to go home. Tr. 143. Gillespie was diagnosed with "uncontrolled hypertension," given new prescriptions for high blood pressure, and discharged with instructions to follow up with Dr. Shaikh. Tr. 134. At the time of his discharge, Gillespie was "ambulatory, awake, alert and oriented to time and place." *Id.* His

abdomen was "soft," with "normal bowel sounds" and no enlargement of the liver or spleen. Similarly, his extremities were "negative for cyanosis, clubbing or edema." *Id.*

One month later, on June 16, 2009, Gillespie followed-up with Dr. Shaikh and reported that he was "feeling ok." Tr. 202. A physical exam noted "abdominal masses" without pain, tenderness or swelling. Tr. 203.

Eight months later, on February 2, 2010, Gillespie applied for Supplemental Security Income. Gillespie claimed that he had been disabled since January 1, 2004, due to swollen feet and he stated that he was not "able to walk very far without getting tired and out of breath." Tr. 77. Gillespie also stated that he had heart disease, back injuries and "hbp/bulge in stomach." Tr. 90. Gillespie filled out a Function Report on March 11, 2010, stating that, despite dizziness caused by his medications, he was able to watch televised church programs every day. He could not, however, dress or shave himself without assistance, and he could not stand long enough to prepare his own meals. He reported going outside approximately 3 times a week for 2-3 hours per day, and that he could drive "sometime[s] when it's only short 3-7 miles." Tr. 103. He also reported that he was able to pay his bills, count change, handle a savings account and use a checkbook. *Id.* He stated that he could walk for approximately 5-10 minutes before having to stop and rest for 15-20 minutes. Tr. 105. In a section provided for additional remarks, Gillespie wrote:

> Feet stay swoll[en], can't find shoes to fit. Eyes stay blurry a lot since my blood pressure went up about a month ago real high 204/160. Chest hurts more often now. I had "back problem" approx. 6 year-8 year ago, Doctor have me a "lifetime impairment rating, got hurt on job, was under "Workers Comp Tx." Also, was diagnosed with some type of "Trauma Mental" when

> I got chased with a gun at work.  Had to run for my life.  I was working for
> this company named "Storage & Processors" in Houston, Tx. approx 2001-
> 2002.

Tr. 107.

On May 15, 2010, Gillespie was seen for a consultative examination by Dr. Daryl

K. Daniel, M.D.  Tr. 255.  Dr. Daniel's report noted that Gillespie's medical records

showed a previous diagnosis of hypertension and hyperlipidemia.  Tr. 253.  Gillespie's

chief complaints to Dr. Daniel were recorded as "heart disease . . . back . . high blood

pressure . . . stomach . . . swollen feet."  *Id*.  He reported occasional chest pain "with

fluttering," which had worsened over the past six months and increased when he "ate

meat."  Gillespie stated his "discomfort can last 45 minutes to one hour with palpitation;

shortness of breath, nausea, vomiting and dizzy spells,"  and reported being told that his

heart was "enlarged" and that he had "congestive heart failure."  *Id*.  Gillespie told Dr.

Daniel that he had fallen and injured his back in 2002, but he had not had an MRI or any

injections to his back, and that he did not wear a back brace or use a TENS unit.  *Id*.

Gillespie reported high blood pressure, but stated that he had "good control of his

blood pressure from the medication that he takes" and he denied having a stroke in the

past.  He complained that his high blood pressure caused him to suffer blurred vision and

headaches.  Gillespie told Dr. Daniel that he had "trouble with his stomach for the past

three years" and that he had been diagnosed with "an abdominal hernia" which "get[s]

very hard on occasion" and that he sometimes had nausea or diarrhea but that he could

"tolerate most foods without a problem."  Gillespie told Dr. Daniel that he had not seen a

gastroenterologist or had an EGD or colonoscopy performed.  Tr. 254.  Finally, Gillespie

8

told Dr. Daniel that he experienced swelling in his feet, which was greater on the right side, and that he had been prescribed medication to treat the swelling. *Id.*

At his visit with Dr. Daniel, Gillespie's weight was 312 pounds and his blood pressure was 134/78. No cardiac or respiratory problems were noted, and his abdomen was "essentially non-tender, non-distended, soft, without increased organ size" and his bowel sounds were "normal." Tr. 254. No swelling or edema was noted. *Id.* Dr. Daniel stated that Gillespie's reflexes and range of motion were "normal," that he had "no difficulty ambulating or standing up from a sitting position," and he was "able to bend over to touch toes, walk on heel and squat." Tr. 255. After a physical examination of Gillespie, Dr. Daniel noted, under a section of the report entitled "Clinical Impressions" that Gillespie suffered from "congestive heart failure with peripheral edema, chronic back pain, hypertension, ventral/abdominal hernia, peripheral edema likely secondary to congestive heart failure, [and] morbid obesity." Tr. 255. A lumbar x-ray report from that day states that there was "no apparent compression fracture" in Gillespie's lumbar spine. Tr. 257.

On June 5, 2010, Dr. Scott Spoor, M.D., completed a Physical Residual Functional Capacity Assessment for Gillespie. Tr. 258. Dr. Spoor opined that Gillespie could occasionally lift and/or carry as much as 50 pounds, and frequently lift or carry as much as 25 pounds; stand and/or walk for about six hours in an 8-hour workday, and sit for about six hours in an 8-hour workday; and that his pushing and pulling abilities were unlimited. Tr. 259. Dr. Spoor did not find any postural, visual, manipulative, communicative, or environmental limitations. Tr. 260-263. Dr. Spoor further noted that

Gillespie's apparent diagnosis of "congestive heart failure" by Dr. Daniel had been made on the basis of "bilateral peripheral edema," but Dr. Spoor noted that "there is no MDI for this in file and no other signs of CHF on exam." Tr. 264.

A second Physical Residual Functional Capacity Assessment was completed by Dr. Patty Rowley, M.D. on January 4, 2011. Dr. Rowley's assessment of Gillespie's physical abilities was similar to Dr. Spoor's, except that Dr. Rowley opined that Gillespie should be limited to occasional climbing of ramps and stairs, and occasional balancing. Tr. 268. Like Dr. Spoor, Dr. Rowley concluded that "[t]he alleged limitation caused by the claimant's symptoms are not fully supported by evidence." Tr. 271. Dr. Rowley also noted that Gillespie's diagnosis of "congestive heart failure" by Dr. Daniel was not supported by the record. Tr. 272.

On January 27, 2012, Gillespie was seen as a walk-in patient at the Memorial Hermann Emergency Room, seeking treatment for high blood pressure, a headache, and "chest discomfort." Tr. 278. His blood pressure was 190/104 and a physical exam performed when he arrived did not note any obvious physical problems other than an "irregular" heart rhythm and "generalized edema." Tr. 284. Gillespie's edema was rated as mild, "1+, no indentation." Tr. 285. After medication was administered, Gillespie's blood pressure and heart rhythm returned to normal within two hours of his admission.

Tr. 291. After an EKG,[1] Gillespie was diagnosed with hypertension then discharged as "stable." Tr. 279.

### B. ALJ Hearing and Decision

Gillespie, represented by counsel, appeared on May 1, 2012 before ALJ Paul Schwarz. Woodrow Janese, M.D., an impartial medical expert, and Charles Poor, an impartial vocational expert, also testified at the hearing.

At the beginning of the hearing, Gillespie's counsel informed the ALJ that he had been seen at the Memorial Hermann E.R. in January, but that the medical records had not yet been sent to the ALJ. The ALJ allowed Gillespie ten business days to supplement the record, instructing counsel that "If I don't have it then, the presumption is that it doesn't exist and I will decide the case after the close of business on that day and that will be the outcome of that." Tr. 338. During the hearing, Gillespie's counsel amended his date of the alleged onset of disability from January 1, 2004 to February 2, 2010. Tr. 348.

Gillespie testified that he was 53 years old, 5'11" and weighed 293 pounds. Tr. 339. He described his educational background, and stated that he had last worked, as a truck driver, in 2009. Tr. 339. Gillespie explained that he stopped working as a truck driver because he couldn't pass the required physical. Tr. 340. He stated he could not work because of "the knot in my stomach and my feet [swelling] to the point where I can't wear shoes or regular proper work boots." Tr. 340. Gillespie stated that his feet were "constantly swollen." Tr. 340. He did not, however, use a cane or other assistive

---

[1] The EKG report stated: "Cardiomegaly or pericardial effusion results in enlargement of the cardiac silhouette. There is mild congestive change without focal consolidation, effusion or pneumothorax. The pulmonary vasculature is normal." Tr. 334

device. Tr. 340. He described his feet as "numb" and "cold" due to the swelling, and stated he elevated his legs and avoided salt to help alleviate the swelling. Tr. 341. He explained that, although he had high blood pressure, he could not be seen by a cardiologist because he did not have insurance. Tr. 341. He also stated that the medications he took for high blood pressure made his head hurt and caused him to urinate often. Tr. 342. He chronic chest pain, "about two or three times a month," that caused him trouble breathing and sleeping. Finally, he also noted "irregular" back pain that "just comes." Tr. 342.

Next, Gillespie explained he had received unemployment benefits until 2010 and that, after he stopped receiving those benefits, he tried to find work but could not. Tr. 344. He sometimes earned money by assisting his brother with his trucking business "a couple times a month." Tr. 343. According to Gillespie, this meant that he would use the computer to research available trucking loads for hire, and inform his brother of appropriate jobs. Tr. 344. Gillespie stated he was not able to sit for long periods of time without his feet swelling, and that he could stand for only 20 minutes. He stated he could only walk a quarter of a block and estimated that he could only lift 15 to 20 pounds. Tr. 346. He stated he was not able to dress himself without assistance, and that he could not perform yard work or chores. Tr. 347.

Next, the medical expert, Woodrow Janese, M.D., testified that Gillespie's vision was 20/70 in both eyes and his health problems included hypertension, obesity, "a stomach bulge," and back pain. Tr. 349. Based upon the medical records presented to him, Dr. Janese opined that Gillespie's severe impairments, even in combination, did

meet or medically equal any listing-level impairments. Tr. 349-350. Dr. Janese next testified that he had specifically considered Listing 4.2 with respect to Gillespie's allegation of "chronic heart failure." Tr. 350. Dr. Janese opined that Gillespie's residual functional capacity was "medium with six hours of sitting and six hours of standing." Tr. 350. Gillespie's attorney declined the opportunity to cross-examine Dr. Janese. *Id.*

Next, the vocational expert, Charles Poor, testified that Gillespie's past relevant work was as a Heavy Truck Driver and a Light Truck Driver, both of which were classified as "medium" and "semi-skilled." Tr. 351. Mr. Poor testified that a person who could perform work at a level of medium exertion could perform both of these jobs. *Id.*

The ALJ next carefully questioned Dr. Janese about whether Gillespie's medical records contained any evidence regarding his "abdominal hernia," particularly in light of Dr. Daniel's "clinical impression" in his consultative examination report:

```
ALJ:     Dr.  Jenice  [sic],  did  the  medical  record  say
         anything about a hernia.  I know at F5 there was
         the report done on January 4th of 2011 reflected
         complaints   of   hypertension,   obesity,   stomach
         bulge and back pain.

ME:      Your  Honor,  I  think  that's  what  that  stomach
         bulge is.

ALJ:     Right.   So  the  question  is,  is  it  more  than  a
         complaint? Lots  of  people  in  Texas  have  stomach
         bulges  as  the  result  of  consuming  more  than  one
         six  pack  of  beer  on  a  regular  basis.    So,
         question  now  is  it  a  medically  diagnosed  hernia
         or  is  it  just  a  pot  belly  that  people  get  in
         Texas?
```

ME:      I didn't see that, that it was a formal
         diagnosis, Your Honor.   I think it was made
         obliquely.  Also, Your Honor, I was just going to
         mention listening to the - -

ALJ:     Now, I want you to just answer my questions.   I
         don't need a narrative explanation unless you
         said something that was unclear.

ME:      What I was going to say was that in B2F16 he was
         able to return to work.  The doctor stated that
         he was able to return to work.

ALJ:     What was the date of that, B2F-16?

ME:      November of 2008.

ALJ:     That obviously precedes the 5F exhibit on which
         the repeat of the complaint of the stomach bulge
         was made.

ALJ:     Is there any place in the record that you know
         if, Counselor, where there is a diagnosis of a
         hernia?

ATTY:    The [consultative exam by Dr. Daniel], Your
         Honor.

ALJ:     B3F?

ATTY:    The physician diagnosed him with an abdominal
         hernia.  My pagination is off.  If you give just
         one moment I can tell you what page it is.

ALJ:     Yes, go ahead please.

ME:      I think it's B3F2, Your Honor.

ALJ:     B3F-2?  In the diagnosis there is what?

ME:     The abdominal examination doesn't mention any hernia, Your Honor.  The only comment is, "abdomen essentially nontender, non-distended, soft without increased guarding signs.  Bowel sounds are normal."  That would be where they would either indicate an umbilical hernia, which would be uncommon or an inguinal hernia.

ALJ:    Have you found it?

ATTY:   Yes, Sir, B3F, page 3 and then also it's at B2F, as well, Your Honor.

ALJ:    And what is it styled as?

ATTY:   Bear with me just one moment.

ME:     It says ventral abdominal hernia, Your Honor.

ALJ:    Ventral abdominal hernia?

ME:     Yes.

ALJ:    Okay.  Now that's a very common condition, right?  Correct?

ME:     Well, they would have put that in there, Your Honor, in the abdominal part of the examination.

ALJ:    Well, I mean, is Counsel reading from something you're not reading from.  She's quoting something here in the record.

ME:     No.  It's the diagnosis, Your Honor.  It says clinical impression.  But in the physical examination he doesn't make note of it.  It might be by history.  See, it says at the top of page 2 it says, "He has been trouble with his stomach for the past three years and has been diagnosed with an abdominal hernia.  He states that the hernia is in his mid-abdomen and does get very hard with nausea."  I mean, if you had a problem, you would examine it and put it in your physical examination.

ATTY:   They do reference it, Your Honor, at B2F, page 3 on physical exam.  Is that the page we're looking at?

ALJ:    I thought it was B3F-3.

ATTY:   Both.

ALJ:    Okay.

ME:     At B3F-2 is the physical examination and they do not reference it.  If you look down at the bottom concerning the abdomen it is referenced by history when the patient complains.

ATTY:   Looking under the diagnosis and then the physical exam at B2F page 3, it's handwritten, but it's referenced.

.  .  .

ATTY:   B3F, I'm looking strictly under the diagnosis. And B2F, page 3, I'm looking at Bissonnet Medical Center Medical History Synopsis.

ME:     Now, you said B2F-3?

ATTY:   Yes.

ME:     I'm not sure exactly.  This is just a form page. It says abdominal something and that's also a synopsis.

ATTY:   Physical Exam: Abdominal mass.  It's checked and it says, "Abdominal hernia."   And then under Synopsis, it's referenced there.

ME:     What does that say after abdominal mass?  What does that say, "abdominal" something?  Hernia? Is that what it says?

ATTY:   I believe so.

ME:     Well, I'm not sure what that form is Your Honor. Who did that?  Who was the doctor that did that. I mean there is some kind of a checkmark down on there.  I wasn't impressed with that, Your Honor.

```
ALJ:      What does that mean doctor?  It's either in the
          record or not.  I didn't ask you if you were
          impressed by it.

ME:       In my opinion, I did not think he had it, Your
          Honor.  That's what that means.

ALJ:      Okay.

ME:       I reviewed all these records and I did not think
          he had it.  If a physician examines a patient and
          they were concerned about it, they would refer to
          the surgeon and the surgeon would give him his
          opinion.

ALJ:      Okay.  Cross on that?

ATTY:     Nothing further, Your Honor.
```

Tr. 354-358.

On June 18, 2012, the ALJ issued his opinion, finding that Gillespie was not disabled.  The ALJ first noted that Gillespie had not submitted any medical records regarding his January 2012 visit to the emergency room.  Next, the ALJ proceeded with the five-step sequential evaluation.  He first found that Gillespie had not engaged in substantial gainful activity since his alleged onset date of February 2, 2010.  Tr. 16. Next, the ALJ found that Gillespie suffered from the severe impairments of "vision problems," back pain, congestive heart failure, and obesity.  Tr. 16.  After reviewing portions of the medical record and summarizing Dr. Janese's opinion, the ALJ concluded that Gillespie's "abdominal bulge/hernia" was "not severe."  Tr. 17.  Next, the ALJ found that Gillespie did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ compared the criteria of the listings for vision

problems, back pain, and chronic heart failure with Gillespie's medical records and symptoms, and also evaluated the impact of Gillespie's obesity. Tr. 18-19. The ALJ found that, after considering the entire record, Gillespie had a residual functional capacity to perform the full range of medium work, and that he was therefore capable of performing his past work as a truck driver. Tr. 21-22. Accordingly, the ALJ concluded that Gillespie was not disabled as of February 2, 2010. Tr. 22.

Gillespie appealed the ALJ's decision to the Appeals Council, this time providing the records from his January 2012 emergency room visit. The Appeals Council accepted this new evidence, making it part of the administrative record, but upheld the ALJ's decision.[2] Accordingly, Gillespie filed this lawsuit to seek review of the ALJ's decision.

The Commissioner has filed a Motion for Summary Judgment and Memorandum in Support, arguing that summary judgment should be granted in her favor and because substantial evidence supports the ALJ's decision and the ALJ used the proper legal standards in evaluating the evidence. Dkt. 11, 12. Gillespie has filed a "Motion for Default Judgment/and Response to Defendant's Motion for Summary Judgment." Tr. 13.[3] In his Response, Gillespie argues that summary judgment should not be granted for the Commissioner because the ALJ did not review all of his medical records from Sugar Land Methodist Hospital, and because he cannot regain work as a truck driver since he cannot pass the required medical exam. Additionally, Gillespie argues that his stomach hernia is "debilitating and disfiguring" and that Dr. Shaikh has told him that he cannot

---

[2] Accordingly, the medical record is included in the Court's factual background *supra*.
[3] This Court has denied Gillespie's Motion for Default Judgment. Dkt. 14.

undergo surgery to repair it due to his high blood pressure.  Lastly, Gillespie argues that his eyesight problems amount to "almost total blindness and extreme marred vision/perception for periods of times." Dkt. 13.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d. 1069, 1075 (5th Cir. 1994).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.* 529 F.3d 335, 339 (5th Cir. 2008).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F. 3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III.    STANDARD OF REVIEW

Judicial review of the ALJ's final decision under 42 U.S.C. § 405(g) is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the proper legal standard was used in evaluating the evidence.

*Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995); *Anthony v. Sullivan,* 954 F.2d 289, 292 (5th Cir. 1992). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Court must affirm the ALJ's final decision where substantial evidence supports the ALJ's decision and the Commissioner followed the relevant legal standards. *See Higginbotham v. Barnhart,* 405 F.3d 332, 335 (5th Cir. 2005). Reversal is appropriate only where no credible evidentiary choices to support the Commissioner's decision. *See Johnson v. Bowen,* 864 F.2d 340, 343–44 (5th Cir. 1988). In the determination of the claimant's ability to receive disability insurance and supplemental security income benefits, the Court must scrutinize the record as a whole to determine if the decision reached was reasonable and supported by substantial evidence. *Higginbotham,* 405 F.3d at 335. "Substantial evidence" means enough evidence "that a reasonable mind might accept it as adequate to support a conclusion." *Audler v. Astrue,* 501 F.3d 446, 447 (5th Cir. 2007). This Court may not reweigh the evidence, try the issues de novo, or substitute judgment for the Commissioner's finding. *Id.*

## IV. ANALYSIS

### A. Statutory Basis for Benefits

Social Security disability insurance benefits are authorized by Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and

disabled, regardless of indigence.  *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

SSI benefits are authorized by Title XVI of the Social Security Act and provide an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. 20 C.F.R. § 416.110.  Eligibility for SSI is based on proof of disability and indigence.  *See* 42 U.S.C. § 1382(c)(a)(3) (definition of disability); 42 U.S.C. § 1382(a) (financial requirements).  Although these are separate and distinct programs, applicants to either program must prove "disability" under the Act.  *See* 42 U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382(c)(3)(A) (SSI).  The law and regulations governing the determination of disability are the same for both programs. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

## B.    Determination of Disability

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."  *Id.* § 423(d)(2)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological

abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques. *Id.*; 42 U.S.C. § 1382c(a)(3)(B).

The five-step "sequential evaluation" process for determining disability is set out in the Commissioner's regulations. The steps are: (1) Is the claimant currently performing substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent the claimant from doing past relevant work? (5) Does the impairment prevent the claimant from doing any other work? *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007) (summarizing C.F.R § 404.1520(a)(4)(i)-(v)). If, at any step, the ALJ determines the claimant to be disabled, the determination is conclusive and the inquiry ends. *Id.*

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform. *Id.* The Commissioner's analysis at steps four and five is based on the assessment of the claimant's RFC, or the work a claimant still can do despite his or her physical and mental limitations. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545 and 416.945. The Commissioner assesses the RFC before proceeding from step three to step four. *Id.* Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut the finding. *Id.*

### C. The ALJ applied the correct legal standard, and substantial evidence supports the ALJ's decision.

Step two of the sequential process requires the ALJ to determine whether the claimant has a medically determinable impairment or combination of impairments that are "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). The Social Security Regulations define a "severe" impairment as one that significantly limits a claimant's physical or mental ability to do basic work activities. *Id*. The Fifth Circuit, however, has found that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act. *Stone*, 752 F.2d at 1104–05. *Stone* instead states: "An impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Id*. at 1101; *see also Loza v. Apfel*, 219 F.3d 378, 390–91 (5th Cir. 2000) (reaffirming this standard following federal regulatory revisions). The *Stone* standard "brooks no tolerance for interference with a claimant's ability to work." *Foster v. Astrue*, No. H–0802843, 2011 WL 5509475 at *13 (November 10, 2011).

Reviewing the record and the ALJ's opinion, the Court finds that the ALJ properly and applied the *Stone* standard with respect to Gillespie's alleged impairments, including his abdominal hernia. In finding that the hernia was not a "severe" impairment, ALJ noted that Gillespie had not seen a specialist or undergone an EGD or colonoscopy, and he took into account Dr. Janese's opinion that, if Gillespie's medical providers believed he did indeed suffer from a hernia, they would have referred him for further treatment.

Further, there is no objective medical evidence in the record to show that the "abdominal hernia/bulge" interfered in any way with Gillespie's ability to work.  Gillespie himself confirmed that he was "able to tolerate" most food, and, in the period between 2002 and 2012, he only twice complained of any abdominal pain to medical personnel.  Although he alleged occasional nausea and diarrhea to Dr. Daniel in 2010, the records show that, in 2002, Gillespie's actual complaint was "constipation," and that his stomach pain quickly resolved.  His second allegation of stomach "discomfort," made to Dr. Shaikh on May 21, 2008, also resolved itself without any apparent medical intervention.  During that 2008 visit, even though Gillespie alleged "discomfort" as his chief complaint, a physical exam did not show any abdominal tenderness or pain, or any other physical limitations. Similarly, Dr. Daniel's consultative exam did not find any limitations in Gillespie's ability to perform basic physical tasks.  Although Gillespie testified that he blamed many of his alleged symptoms and inability to work on his stomach "knot", the ALJ found that Gillespie's testimony about his limitations was not wholly credible.

The Court has deliberately and exhaustively reviewed the evidence in the record. In consideration of Gillespie's *pro se* status, the Court has set that evidence out at length *supra*.   After so reviewing and summarizing this evidence—much of which is also discussed and summarized in the ALJ's decision—the Court finds that the evidence set out above does indeed amount to "substantial evidence" supporting the ALJ's decision that Gillespie was not "disabled" as of February 2, 2010.

In his Response, Gillespie contends ALJ did not review all of his medical records from Sugar Land Methodist Hospital, and that he cannot work pass the required medical

exam to work as a truck driver.  However, records from Sugar Land Methodist Hospital were indeed admitted, and they were considered by the ALJ and the medical expert in this case.  The Court has also reviewed those records in detail, as set out above.

Further, there is no evidence in the record regarding the medical requirements for certification as a truck driver.  Although Gillespie's counsel was afforded an opportunity to cross-examine the vocational expert, her only question was whether a sit/stand option would preclude employment as a truck driver.  Tr. 358.  There was evidence in the record that Gillespie's medications controlled his high blood pressure—Gillespie himself told Dr. Daniel that his medications gave him "good control of his blood pressure."  Although Gillespie did have occasions when he sought medical treatment for "high blood pressure," and related dizziness, the record also shows that he was sometimes non-compliant with his medications and his complaints always quickly resolved.

Lastly, Gillespie argues that his eyesight problems amount to "almost total blindness and extreme marred vision/perception for periods of times."   Dkt. 13.  However, Gillespie admitted to the ALJ that he did not wear glasses and that he could work on the computer and watch television despite his alleged limitations.  Accordingly, substantial evidence supports the ALJ's finding that Gillespie was not disabled.

## CONCLUSION

A review of the record reveals that the ALJ applied the appropriate legal standards in making his determination and that substantial evidence supports the ALJ's determination that Gillespie is not disabled under the relevant provisions of the Social Security Act.  A review of the pleadings and the record on file reflect that there is no

genuine issue of material fact in this case, and entry of summary judgment against Gillespie is therefore appropriate. *See* FED. R. CIV. P. 56. Accordingly, the Court **GRANTS** the Commissioner's Motion for Summary Judgment.

Signed at Houston, Texas on August 29, 2014.

**GEORGE C. HANKS, JR.**
**UNITED STATES MAGISTRATE JUDGE**